**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ERIC POTTER, | Civil Action No. 09-4304 (WJM) |
| Plaintiff, | |
| v. | **OPINION** |
| JAMES GLOVER, et al., | |
| Defendants. | |

**APPEARANCES**:

ERIC POTTER, #307554A
Southern State Correctional Facility
4295 Route 47
Delmont, NJ   08314
Plaintiff *Pro Se*

ALEX JOSEPH ZOWIN
Office of the Attorney General
P.O. Box 112
Trenton, NJ   08611
Attorney for Defendants Stokes and Shaw

MICHAEL JOHN LUNGA
23 Vreeland Road, Suite 250
Florham Park, NJ   07932
Attorney for Defendants Reddy and Godinsky

**MARTINI, District Judge**:

In this case, *pro se* Plaintiff Eric Potter claims that certain medical and administrative officials at Northern State Prison ("NSP") violated his rights under 42 U.S.C. § 1983.   On November 13, 2012, this Court denied motions to dismiss or, alternatively, for summary judgment, and found that the Third Amended Complaint, as supplemented, adequately asserted that Defendants Godinsky and Reddy were deliberately indifferent to Potter's serious medical needs,

contrary to the Eighth Amendment, and that Defendants Stokes and Shaw were deliberately indifferent to the risk that Potter would be imprisoned beyond the expiration of his term, contrary to the Eighth and Fourteenth Amendments.  *See Moore v. Tartler,* 986 F.2d 682, 686 (3d Cir. 1993); *Sample v. Diecks,* 885 F.2d 1099, 1108-1110 (3d Cir. 1989).   Presently before the Court are:   (1) motion for summary judgment filed by Defendants Stokes and Shaw and (2) motion for summary judgment filed by Defendants Reddy and Godinsky.   Potter filed opposition to both motions.   For the reasons expressed below, and pursuant to Rule 78, this Court will dismiss the official capacity claims against Defendants Stokes and Shaw and deny summary judgment on the individual capacity claims against Stokes, Shaw, Reddy and Godinsky.   This Court will also appoint *pro bono* counsel to represent Potter, who is proceeding *in forma pauperis*.

## II.   SUMMARY JUDGMENT STANDARD

Rule 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see also Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 184 (3d Cir. 2010) ("Summary judgment is appropriate if, viewing the record in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.")   "An issue of material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Zavala v. Wal Mart Stores Inc.,* 691 F.3d 527, 545 (3d Cir. 2012).   The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party moving for summary judgment must "identify[]each claim or defense - or the part of each claim or defense - on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  To carry its burden of production, the moving party must "show[] that there is no genuine dispute as to any material fact."  *Id.*  If the movant "fail[s] to show the absence of any disputed material fact . . , the District Court err[s] in granting summary judgment."  *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 148 (1970).[1]  If the moving party has met its initial burden of production, then the nonmoving party must "set out specific facts showing a genuine issue for trial."  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (quoting Fed. R. Civ. P. 56(e)(2)).  "[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Tolan v. Cotton,* 134 S.Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986));  *see also Aman v. Cort Furniture Rental Corp.*, 85 F. 3d 1074, 1080-81 (3d Cir. 1996) ("[W]hen determining whether the moving party has proven the absence of a genuine material issue of fact, the facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be regarded as true, and the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.") (citations and internal quotation marks omitted).

---

[1]  *See Brewer v. Quaker State Oil Refining Corp*., 72 F.3d 326, 329-330 (3d Cir. 1995) ("When the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. . . .   Thereafter, the nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial").

### III. DISCUSSION

A.    Deliberate Indifference to Medically Indicated Hepatitis-C Treatment

"Under the Eighth Amendment, prison officials, from the bottom up, may be liable if by act or omission they display a deliberate indifference to a known risk of substantial harm to an inmate's health or safety."   *Barkes v. First Correctional Medical, Inc.,* 766 F.3d 307 322 (3d Cir. 2014).   A medical need is serious where it "has been diagnosed by a physician as requiring treatment or is . . . so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth County Correctional Institution Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citations omitted).   To establish deliberate indifference, a plaintiff-prisoner must show that the defendant was subjectively aware of the unmet serious medical need and failed to reasonably respond to that need.   *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Erickson v. Pardus*, 551 U.S. 89, 90 (2007).   "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Barkes,* 766 F.3d at 325 (quoting *Farmer,* 511 U.S. at 836).   Deliberate indifference may be shown by an official "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed," *Estelle v. Gamble,* 429 U.S. 97, 104-105 (1976), and where "the prison official . . . prevents a prisoner from receiving needed or recommended medical treatment."  *Dykeman v. Ahsan,* 560 F.App'x 129, 132 (3d Cir. 2014) (quoting *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999)).

In this case, Doctors Reddy and Godinsky concede that they had determined that it was medically appropriate to pursue Potter's readiness for Hepatitis-C treatment and that on January

4

15, 2007, they ordered a psychiatric evaluation as a medically necessary prerequisite to Potter's treatment.[2]   However, the parties dispute whether or not Potter asked medical officials to defer his Hepatitis-C treatment based on his fear of side effects and a potential autoimmune disease. Relying on Potter's electronic medical record (but not on his own personal knowledge), Dr. Godinsky states that "[d]uring his October 3, 2006 Hepatitis-C checkup office visit, Plaintiff requested to defer his Hepatitis-C treatment, for fear of a possible autoimmune disease," and that, "[d]uring his August 17, 2007 Hepatitis-C checkup office visit, Plaintiff again requested to defer his Hepatitis-C treatment, stating that he was afraid of possible side effects."   (ECF No. 117-2 at 2, 3.)   But during his deposition, Potter repeatedly and unequivocally denied telling any medical personnel at Northern State that he wanted to defer Hepatitis-C treatment for fear of autoimmune disease, fear of side effects, or any other reason.[3]   (ECF No. 115-5 at 17, 26.)

This factual dispute is material to deliberate indifference because, if Reddy and Godinsky's failure to obtain the psychiatric evaluation was due to Potter's decision to defer treatment for Hepatitis-C, then the failure was not due to Defendants' deliberate indifference to Potter's medical needs.   Because there is a material factual dispute concerning deliberate indifference, and because a jury could find that, by failing for over two years to follow through with the order for a

---

[2]  In his affidavit, Dr. Godinsky avers that "[o]n January 9, 2006, Plaintiff was cleared for Hepatitis-C treatment," and "[o]n January 15, 2007 . . . a psych consult was ordered to evaluate for hep c tx pre liver biopsy."   (ECF No. 117-2 at 2, 3.)

[3]  For example, in response to repeated questioning from counsel for Doctors Reddy and Godinsky during Potter's deposition as to the indication in the electronic medical records that Potter he wanted to defer treatment, Potter stated, "[i]f it says I wanted to defer treatment, I never did." (ECF 115-5 at 26.)   In addition, Potter states in his opposition:   "At no time during the plaintiff[']s incarceration at Northern State Prison did the plaintiff refuse[], or sign[] a waiver of treatment or ask[] to defer his treatment."   (ECF No. 118-3 at 3.)

psychiatric clearance for Hepatitis-C treatment, Defendants were deliberately indifferent to a known risk to Potter's health.

Defendants also seem to argue that there is no factual dispute as to their deliberate indifference because Potter did not obtain the psychiatric evaluation himself.   Potter responds that he lacked the power to require medical officials to perform a psychiatric evaluation and that the order for a medically necessary psychiatric screening had to be made by Doctors Reddy and Godinsky, after determining that it was medically necessary.   (ECF No. 118-3 at 3.) Specifically, in response to Defendants' argument that Potter should have personally asked Doctors Goldstein and Boseabout to clear him for Hepatitis-C treatment, Potter states that he saw Dr. Goldstein with regard to being cleared for his full minimum status due to the classification department's directive that it was necessary.   Potter is correct that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle,* 429 U.S. at 103.   This Court finds that, viewing the evidence in the light most favorable to Potter, there are factual disputes as why Potter was not evaluated for two years after Defendants ordered the evaluation, and whether the delay in obtaining the evaluation was due to Defendants' deliberate indifference to Plaintiff's medical need for the evaluation as a prerequisite to medically necessary treatment.   Accordingly, this Court will deny the summary judgment motion of Doctors Reddy and Godinsky.   *See Tolan,* 134 S.Ct. 1861.

B.     Deliberate Indifference to Incarceration Beyond Potter's Term

Defendants Stokes and Shaw seek summary judgment on Potter's § 1983 claim that they were deliberately indifferent to the risk that he would be incarcerated beyond the expiration of his prison term.   They claim in their brief that they are entitled to summary judgment because:   (1)

the § 1983 damage claims against Shaw and Stokes in their official capacities are barred by the

Eleventh Amendment (Point Four, ECF No. 115-1); (2) Stokes and Shaw are entitled to qualified

immunity (Point Five, ECF No. 115-1); (3) Potter is barred from recovering compensatory

damages by 42 U.S.C. § 1997e(e) (Point Six, ECF No. 115-1); (4) Stokes and Shaw were not

deliberately indifferent to the risk that Potter would be incarcerated beyond his term (Points One,

Two, and Three, ECF No. 115-1; and (5) Stokes and Shaw are entitled to summary judgment on

Potter's punitive damage claims (Point Seven, ECF No. 115-1).

    (1) Official Capacity Claims against Stokes and Shaw

    Defendants are correct that Potter's § 1983 damage claims against them in their official

capacities are barred by the Eleventh Amendment and because state officials acting in their official

capacities are not persons under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71

& n.10 (1989); *Estate of Lagano v. Bergen County Prosecutor's Office,* ___ F.3d ___, 2014 WL

5155213 (3d Cir. Oct. 15, 2014); *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 660

(3d Cir. 1989).  This Court will dismiss Potter's "official capacity" claims against Stokes and

Shaw.

    (2) Qualified Immunity

    Stokes and Shaw argue that they are entitled to qualified immunity on Potter's § 1983

claims against them in their individual capacities.   They argue that, while the legal rules set forth

in *Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993), and *Sample v. Diecks*, 885 F.2d 1099, 1110

(3d Cir. 1989), were "well-established," (ECF No. 115-1 at 39), these decisions "would not have

placed State Defendants on notice that their actions in responding to Plaintiff's three

[administrative remedy requests] regarding his maximum release date were unconstitutional."  *Id.*

As will be explained below, Stokes and Shaw's qualified immunity defense fails because, as they acknowledge, the law regarding the liability of an official for deliberate indifference to the risk that an inmate would be incarcerated beyond the expiration of his term was clearly established at the time of the events in question.

"Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks,* 134 S.Ct. 2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd,* 563 U.S. ___, ___, 131 S.Ct. 2074, 2085 (2011)). "A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman,* ___ S.Ct. ___, 2014 WL 5798628 *2 (Nov. 10, 2014).   A right is "clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). For example, the Supreme Court recently held in *Carroll* that, where a court relied on only one case for the proposition that the law was clearly established, but that case's holding did not apply because the case was factually distinguishable, the court erred in finding that defendants were not entitled to qualified immunity.[4]

In this case, Defendants' acknowledge that, at the time of the events in question, *Moore,* 986 F.2d 682, and *Sample,* 885 F.2d 1099, were clearly established law.   In *Sample,* the Third Circuit noted that, "[w]here an official with a duty to investigate, check, or report is notified of a

---

[4] "*Marasco*[, the case on which the court relied,] held that an unsuccessful 'knock and talk' at the front door does not automatically allow officers to go onto other parts of the property.   It did not hold, however, that knocking on the front door is *required* before officers go onto other parts of the property that are open to visitors.   Thus, *Marasco* simply did not answer the question whether a 'knock and talk' must begin at the front door when visitors may also go to the back door." *Carroll,* ___ S.Ct. ___, 2014 WL 5798628 at *3.

problem, the cost of his either rectifying the problem himself or reporting the problem to higher authorities will not compete with other aspects of administering the penal system." *Sample,* 885 F.2d at 1109.  While a warden "does not exhibit deliberate indifference by failing to address a sentence calculation problem brought to his attention when there are procedures in place calling for others to pursue the matter . . . , if a prison official knows that, given his or her job description or the role he or she has assumed in the administration of the prison, a sentence calculation problem will not likely be resolved unless he or she addresses it or refers it to others, it is far more likely that the requisite [deliberate indifference] will be present." *Id.* at 1110.  The Third Circuit held in *Sample* that, "[t]o establish § 1983 liability in this context, a plaintiff must first demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted.  Second, the plaintiff must show that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight.  Finally, the plaintiff must demonstrate a causal connection between the official's response to the problem and the infliction of the unjustified detention." *Id.*

There is no dispute in this case that Stokes and Shaw had knowledge of the risk of unjustified detention because they responded to at least three of Potter's administrative remedy requests in which he complained about the miscalculation of his maximum date.  According to Potter, these officials responded to his grievances because they were involved in the classification department and were responsible for such matters.  Moreover, nothing before this Court indicates that Stokes and Shaw referred Potter's complaints to another official for investigation.

The relevant question for qualified immunity purposes is this:   Could Stokes and Shaw have reasonably believed, at the time they received between three and six grievances in which Potter claimed that his release date had been miscalculated, that they could respond to those grievances without conducting a thorough investigation or reporting the problem to an official who was responsible for conducting such an investigation?   Given that *Sample* was clearly established law in 2009 and Defendants have not shown that the facts in Potter's case are distinguishable from those *Sample,* the answer to this question is no.   Because Stokes and Shaw have not shown that they are entitled to qualified immunity, this Court will deny summary judgment on that ground.

(3) 42 U.S.C. § 1997e(e)

In Point Six of their brief, Stokes and Shaw argue that Potter is barred from recovering compensatory damages by 42 U.S.C. § 1997e(e).   This argument fails because Potter was not incarcerated or detained in any facility at the time he brought his original Complaint and § 1997e does not apply to a case unless the plaintiff was a prisoner at the time he filed the complaint.   *See Ahmed v. Dragovich,* 297 F.3d 201, 210 & n. 10 (3d Cir. 2002) (observing that a prisoner who was released at the time he filed his original complaint is not precluded by 42 U.S.C. § 1997e from filing a § 1983 suit for incidents concerning prison conditions which occurred prior to his release); *see also Defreitas v. Montgomery County Correctional Facility,* 525 F.App'x 170, 176 (3d Cir. 2013).   Accordingly, Stokes and Shaw are not entitled to summary judgment on Potter's § 1983 claims against them in their individual capacities on the basis of § 1997e.

(4) Deliberate Indifference to Risk of Incarceration Beyond Term

In Points One, Two, and Three of their brief, Stokes and Shaw argue that they were not deliberately indifferent to the risk that Potter would be incarcerated beyond the expiration of his

term.   This Court found in its prior Opinion that Potter's amended complaint, as supplemented, stated a deliberate indifference claim against Defendants Shaw and Stokes.   Potter alleged that, after the Appellate Division had vacated his consecutive seven-year sentence on July 31, 2007, his aggregate sentence was reduced to seven years.   On May 9, 2009, defendants Stokes and Shaw responded to Potter's remedy request by stating that his maximum date was August 20, 2009 (ECF No. 72-4 at 8), and on June 23, 2009, in response to another administrative remedy request, Shaw and Stokes responded that his maximum date was August 14, 2009 (ECF No. 72-4 at 10).   Potter asserted that on July 7, 2009, he submitted another administrative request in which he insisted that the August 14, 2009, maximum date was incorrect, but he claimed that he received no response to this request.   (ECF No. 72-5 at 11).   In finding that Potter stated a claim, this Court observed that the "Face Sheet Report" attached to Potter's papers (ECF No. 72-4 at 5) indicated that Potter's actual maximum date on his seven-year term was July 17, 2009, and that he was released on July 26, 2009 (ECF No. 72-4 at 5), whereas the "Face Sheet Report" attached to the declaration of Frank Pellegrino showed that Potter's actual max date was July 26, 2009.   (Dkt. 71-4 at 12.)

Despite this factual dispute in documents generated by the New Jersey Department of Corrections regarding Potter's maximum sentence date, Defendants Shaw and Spokes argue that there is no factual dispute regarding Potter's maximum date or the reasonableness of their responses to Potter's repeated claims that his maximum date was improperly calculated.   Since Defendants Stokes and Shaw did not file their own declarations, they have not explained how they determined, in response to Potter's grievances, that his maximum dates were August 20, 2009, and August 14, 2009.   Nor have they revealed what, if any, investigation they undertook before responding to Potter's grievances or denied that they were responsible for either conducting their

own investigation or reporting the matter to an official who was responsible for conducting an investigation.   To support their summary judgment motion, Shaw and Stokes submitted the declarations of Karen Hughes, an Administrative Analyst; Frank Pellegrino, an Inmate Request Coordinator; and the Deputy Attorney General assigned to the instant case.   This Court will outline the contents of these declarations to determine whether Stokes and Shaw have shown that there is no genuine factual dispute and that they are entitled to judgment.

In his declaration, the Deputy Attorney General states that Exhibit A is a true and accurate copy of the transcript of Potter's deposition testimony on January 13, 2014, and that Exhibit B is a true and accurate copy of Potter's inmate credit account statements.   (ECF No. 115-5 at 1-2.)

In his declaration, Frank Pellegrino states that a search of records showed that Potter filed three administrative remedy requests regarding his release date; that Potter did not appeal the staff responses; and that NSP has no record of Potter's administrative remedies dated May 19, 2009, July 7, 2009, or July 22-23, 2009.   (ECF No. 115-4.)   The relevancy of Pellegrino's declaration is unclear, as Defendants do not argue in their summary judgment motion that Potter failed to exhaust available administrative remedies.   In any event, since Potter resided in Neptune, New Jersey, at the time he filed the original Complaint in this action, he was not a "prisoner" within 42 U.S.C. § 1997e(h) and the exhaustion requirement did not apply.   *See Ahmed v. Dragovich,* 297 F.3d 201, 210 & n. 10 (3d Cir. 2002) (observing that a prisoner who was released at the time he filed his original complaint is not precluded by 42 U.S.C. § 1997e from filing a § 1983 suit for incidents concerning prison conditions which occurred prior to his release); *see also Defreitas v. Montgomery County Correctional Facility,* 525 F.App'x 170, 176 (3d Cir. 2013).

Defendants' summary judgment motion essentially relies on the declaration of Karen Hughes.   Hughes states that she is "familiar with the procedure for calculating inmates' maximum dates and ha[s] access to these records."   Notably, she does not aver that she is the person who calculated Potter's release date after the Appellate Division vacated a seven-year sentence, or that she was, at the time of Potter's incarceration in 2009, responsible for calculating release dates or responding to inmates' complaints regarding miscalculation of their release dates.   Instead, referring to five documents attached to her declaration, which she describes as "true and accurate copies of Plaintiff's Calculation Worksheets and Projected Max Date Worksheets," Hughes concludes that, in her view, Potter's correct maximum term date was July 26, 2009, the date on which he was released.   (ECF No. 115-3.)

The first Calculation Worksheet is dated February 26, 2009.   The "prepared by" name on this document is illegible, but it indicates that, as of December 31, 2008, Potter's actual maximum date was September 14, 2009.   (ECF No. 115-3 at 45.)   The second document, labelled "Projected Max Date Worksheet," was prepared by the same person whose name is illegible on the February 26, 2009, worksheet.   (ECF No. 115-3 at 46.)   This worksheet indicates that Potter's projected maximum expiration date was August 14, 2009.   *Id.*   The third document, also a Calculation Worksheet, is dated March 18, 2009.   (ECF No. 115-3 at 47.)   This worksheet, which appears to have been prepared by the same person who prepared the others, indicates that Potter's actual maximum date, as of January 31, 2009, was September 10, 2009.   (ECF No. 115-3 at 47.)   The fourth document, labelled Projected Max Date Worksheet, is dated March 18, 2009, and appears to have been prepared by the same person.   According to this document, Potter's projected maximum date was July 25, 2009.   (ECF No. 115-3 at 48.)   The fifth document, an

13

undated Calculation Worksheet, indicates that it was prepared by Janeene Brown and that Potter's actual maximum date was July 26, 2009.   (ECF No. 115-3 at 49.)

Hughes expresses her belief that this undated Calculation Worksheet prepared by Janeene Brown correctly calculated Potter's maximum term date as July 26, 2009.   Using the passive voice, and without averring that she was involved in preparing this worksheet or determining Potter's release date in 2009, Hughes states:

> When Plaintiff's "projected max date" was reviewed for the final time, it was discovered that the July 25, 2009 "projected max date" assumed that Plaintiff would accrue 5.6 work credits in March 2009.   However, Plaintiff actually accrued only four work credits in March 2009 . . . .   It was also discovered that the July 25, 2009 "projected max date" assumed that Plaintiff would accrue only 4.8 work credits in July 2009.   However, Plaintiff actually accrued 5 work credits in July 2009 . . .   Therefore, the maximum date was changed from July 25, 2009 to a final maximum date of July 26, 2009.

(ECF No. 115-3 at 5-6.)

Hughes also attempts to explain the discrepancy between the maximum date – July 17, 2009 - stated in Face Sheet attached to Potter's prior submission (ECF No. 72-4 at 5) and her own calculation of Potter's release date as July 26, 2009.   Hughes maintains that the Face Sheet attached to Potter's papers, which she claims was printed on March 2, 2010,

> is incorrect as it reflects <u>duplicate</u> work and minimum credits for the month of June, 2009.   This occurred because the six (6) work credits and three (3) minimum credits that Plaintiff earned in June 2009, were <u>manually</u> posted on July 21, 2009, a few days prior to the July 26, 2009 release.   The computer program that posts the work and minimum credits earned by an inmate runs on the fourth Friday of every month, and <u>automatically</u> updates the previous month's credits.   Therefore, when the computer program updated on July 24, 2009, it included the same six (6) work credits and three (3) minimum credits that were <u>manually</u> posted on July 21, 2009, duplicating the June 2009 credits.   The erroneous credits were not caught prior to Plaintiff's release on July 26, 2009 because offenders are released based on <u>manual verification</u> of the calculation, which advances work and minimum credits based on the offenders' custody status/job assignment.   The duplicate manual credits were not removed until June 6, 2011.

14

(ECF No. 115-3 at 6-7.)

However, a few paragraphs later, Hughes asserts that "[t]he duplication was discovered on June 20, 2011 and removed."   (ECF No. 115-3 at 8.)   Moreover, without providing a foundation establishing personal knowledge, Hughes claims that Potter received no work credits for the period from March 1, 2009, through March 11, 2009, because he "was not paid" for this time period.   *Id.*

In his opposition papers, Potter states that, during 2009, Defendant Shaw "worked in the classification department at Northern State Prison and was assigned to respond to inmate grievances filed by inmates who had concerns about their status or max dates," and that Defendant Stokes was at various times the chairperson of the classification routine meeting and he signed off on the responses to Potter's grievances concerning his release date.   (ECF No. 120 at 8.)   Potter sets forth his own calculations of his release date, which are based on the maximum date of September 29, 2009, set forth in the New Jersey State Parole Board's Case Summary dated September 4, 2008, which was "certified" on August 28, 2008, after the Appellate Division reduced Potter's aggregate sentence to seven years.   (ECF Nos. 72-4 at 4, 120 at 29.)   This document shows that on September 4, 2009, the Parole Board determined that Potter became eligible for parole on April 16, 2008, and that, as of August 1, 2008, his maximum date was September 29, 2009.   *Id.*   Potter proceeds to deduct from this September 29, 2009, maximum date, four work credits per month for the months of July 2008, August 2008, September 2008, October 2008, November 2008, December 2008, January 2009, and February 2009, and comes up a release date of August 28, 2009, as of the end of February 2009.   (ECF No. 120 at 9.)   It is

undisputed that Potter was awarded full minimum status on March 11, 2009, and that this classification increased his monthly credits to from 4 to 9 days a month.   Potter disputes Hughes's unsupported contention that he did not receive any work credits for the first 11 days in March 2009, and states that he in fact received 8 days of work and minimum custody credits for March 2009, which reduced his maximum date from August 28, 2009, to August 21, 2009.   *Id.* at 10. Potter then deducts 9 days per month of credit for April 2009, May 2009, and June 2009, 8 days for July 2009, and two days of jail credits awarded in his judgment of conviction on Indictment No. 03-04-0646, and comes up with a maximum date of July 17, 2009 (the date reflected in the March 2010 Face Sheet).   Potter avers that, after he filed six grievances concerning the miscalculation of his maximum date, on Wednesday, July 22, 2009, he spoke with Ms. Elizabeth Cromer, the Clinical Director of his therapeutic program, and informed her that his sentence had expired.[5]   He further avers:

> Ms. Cromer told the plaintiff that she was scheduled to sit on the classification committee[']s meeting that was going to be scheduled for the next day with administrator Frank Pedalino and that if the plaintiff filled out a grievance form and hand[ed] it to her on Thursday morning that she would personally give it to Mr. Pedalino.   The plaintiff did fill out the grievance form and gave it to Ms. Cromer that Thursday morning.   On Friday July 24, 2009[,] the very next day[,] the plaintiff was called to take exit photo which is usually done 2 weeks to 1 month before an inmate is being released . . .   [P]laintiff was told on Sunday July 26, 2009 at 4:00 P.M. that he was being released . . .   The plaintiff was released at 9:00 P.M. that Sunday evening walking down the highway carrying as much property as the plaintiff could carry seeking a bus or a cab to Penn Station.

(ECF No. 120 at 12.)

In response to Hughes's contention that the Face Sheet reflected double credits for June 2009, Potter notes that Defendants "have not produced any documents or provided any names of [the person] who manually gave the plaintiff 9 additional credits for the month of June 2009[, and

---

[5] Potter is correct that July 22, 2009, was a Wednesday.

they] also have not mentioned the fact that the plaintiff also received 8 credits for the month of July 2009." (ECF No. 120 at 13.) In his brief opposing summary judgment, Potter convincingly argues that, if Hughes is correct that officials awarded Potter nine duplicate days for June 2009, and that this mistake was not recognized by officials until 2011, then it follows that "plaintiff was released 9 days before his max date and that the plaintiff[']s max date would not have been July 26, 2009, but rather August 4, 2009[,] 9 days later." *Id.* at 19. He asserts that Eric Stokes and Stephen Shaw, as an administrator with classification responsibilities and a senior Classification Officer,

> had the duty to respond and correct the plaintiff[']s grievances concerning his max date. Both defendants knew what the consequences would be if they did not take any meaningful action or pass the matter on to someone else. The plaintiff was no stranger to these defendants as the plaintiff ha[d] filed over 12 grievances concerning his medical problems, full minimum status and max date. The defendant Eric Stokes signed every grievance form [and] Shaw . . . reviewed numerous grievances submitted by the plaintiff concerning his full minimum status and his max date . . . The only measure that the defendant Stephen Shaw took was to look into the computer and respond back to the plaintiff what date was in the computer and that defendant Eric Stokes signed off on this response. These two defendants have been in a lot of situations involving inmates that were held pas[t] their max dates.

(ECF No. 12-0 at 19-20.)

Potter argues that this Court should deny Stokes and Shaw's summary judgment motion because he has shown that there is a genuine dispute of material fact and a jury could reach a verdict in his favor on his Eighth and Fourteenth Amendment claim that he was incarcerated beyond his maximum release date. *Id.*

In response to Potter, Stokes and Shaw's attorney argues that Potter's calculations are incorrect because (1) Potter received duplicate work credits for the month of June 2009 (because some unspecified person put the credits into the computer manually on July 21, 2009, and the

computer automatically put in the same work credits on July 24, 2009); (2) Potter only earned four work credits in March 2009, instead of the projected 5.6 days; and (3) although the Parole Board's calculation indicates that Potter's maximum date, as of August 1, 2008, was September 29, 2009, the Parole Board nevertheless included Potter's work credits for August 2008 in determining that his maximum date was September 29, 2009, as of August 1, 2009.   (ECF No. 121 at 3.)

In determining whether Defendants have carried their burden of production, this Court notes that Defendants have not provided an affidavit based on personal knowledge to support the three grounds Defendants rely on to challenge Potter's and the Face Sheet's calculations that Potter's maximum date was July 17, 2009.   Defendants have not produced an affidavit of the person who allegedly gave Potter double credits for June 2009.   Defendants have not produced an affidavit based on personal knowledge to support their contention that Potter received fewer than the projected work credits for March 2009, and they have not produced an affidavit based on personal knowledge to support their contention that the Parole Board's certified statement that Potter's maximum date was September 29, 2009, as of August 1, 2008, really meant that Potter's maximum date was September 29, 2009, *as of September 1, 2008*.   Accordingly, it appears that Defendants have not carried their burden of production and they have not shown the absence of a factual dispute concerning the date on which Potter's sentence expired.

Despite this factual dispute, Defendants argue that they are entitled to summary judgment because there is no factual dispute regarding whether they were deliberately indifferent, *i.e.*, whether they conducted a reasonable investigation in response to Potter's several grievances concerning the miscalculation of Potter's maximum release date or whether their investigations were inept.   However, because Stokes and Shaw have not submitted their own affidavits, they

have not explained what they did in order to respond to Potter's grievances or shown that they conducted any investigation concerning the calculation of Potter's sentence or reported the matter to someone who conducted an investigation.   In other words, Defendants have not carried their burden of production of showing that there is no genuine dispute as to whether they responded reasonably to the risk that Potter would be incarcerated beyond the expiration of his sentence. Accordingly, they have not carried their burden of production and are not entitled to summary judgment.   *See Adickes,* 398 U.S. at 148.

Moreover, even if Defendants had carried their burden of production, Potter has shown the existence of factual disputes concerning the date on which his sentence expired and whether Defendants Stokes and Shaw were deliberately indifferent to the risk that Potter would be incarcerated after the expiration of his sentence.   This Court will, accordingly, deny their summary judgment motion.   *See Tolan,* 134 S.Ct. 1861.

(5) Punitive Damages

In Point Seven of their brief, Defendants seek summary judgment on Potter's request for punitive damages under § 1983, on the ground that there is no evidence that their conduct involved reckless or callous indifference to Potter's rights.   Individual public officers are liable for punitive damages under § 1983 for their misconduct on the same basis as other individual defendants.   *See Smith v. Wade,* 461 U.S. 30, 35 (1983).   The decision to award punitive damages, however, is generally a jury question.   *See Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 269-70 (1981). Malicious intent is not a prerequisite for the award of punitive damages under § 1983.   *Smith,* 461 U.S. at 51.   Rather, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct . . . involves reckless or callous indifference to the federally

protected rights of others."   *Id.* at 56; *see also Springer v. Henry,* 435 F.3d 268, 281 (3d Cir. 2006) (holding that a jury may award punitive damages where the defendant's conduct violating plaintiff's constitutional rights is reckless or callous).   "The focus is on the character of the tortfeasor's conduct – whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards.   If it is of such a character, then it is appropriate to allow a jury to assess punitive damages."   *Smith,* 461 U.S. at 54.

As explained above, to establish deliberate indifference liability under § 1983 on Potter's Eighth Amendment claim, the jury must find that the defendant was subjectively reckless, *i.e.*, that the defendant "disregards a risk of harm of which he is aware."   *Farmer,* 511 U.S. at 837; *see also Kolstad v. American Dental Ass'n,* 527 U.S. 526, 536 (1999).   As Defendants Stokes and Shaw have not established the absence of a factual issue concerning whether they responded to Potter's problem with reckless indifference, they have not carried their burden of showing that they are entitled to summary judgment on the punitive damages claims under § 1983.   *See Adickes,* 398 U.S. at 148.

C.     Appointment of Counsel

This Court notes that, once a court finds that an indigent party's case has arguable merit, in deciding to appoint counsel, the court should "consider a number of additional factors including: (1) the plaintiff's ability to present his or her own case; (2) the difficulty of the particular legal issues; (3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue investigation; (4) the plaintiff's capacity to retain counsel on his or her behalf; (5) the extent to which a case is likely to turn on credibility determinations; and (6) whether the case will require testimony from expert witnesses."   *Cuevas v. United States*, 422 F.App'x. 142, 145 (3d

Cir. 2011) (citing *Tabron v. Grace*, 6 F.3d 147, 155-57 (3d Cir. 1993)).   Given the fact that this case will go to trial and will turn on credibility determinations, this Court finds that the appointment of *pro bono* counsel for Potter, pursuant to 28 U.S.C. § 1915(e)(1), is in the interest of justice.

### III.   CONCLUSION

This Court grants summary judgment on the official capacity claims, denies summary judgment on the individual capacity claims, and appoints *pro bono* counsel for Plaintiff.

s/William J. Martin

_____

**WILLIAM J. MARTINI, U.S.D.J.**

DATED:   November 14, 2014